## ALLEN v. UNITED STATES.

### No. 12437.

United States Court of Appeals
Ninth Circuit.

Jan. 4, 1951.

Rehearing Denied Feb. 19, 1951.

R. Max Etter, William E. Cullen and Therrett Towles, all of Spokane, Wash., J. F. Emigh, Butte, Mont., James A. Murray, Washington, D. C., for appellant.

Harvey Erickson, U. S. Atty., Spokane, Wash., Donald J. Stocking, Spc. Asst. to U. S. Atty., Seattle, Wash., for appellee.

Before DENMAN, Chief Judge, and HEALY and POPE, Circuit Judges.

POPE, Circuit Judge.

The appellant, together with one Keane and one Grismer, were charged with devising and putting into execution a scheme to defraud purchasers and prospective pur-

chasers of stock of two Idaho corporations, —the Lucky Friday Extension Mining Company, for brevity referred to as "Extension", and Pilot Silver-Lead Mines, Inc., here called "Pilot".

The alleged false and fraudulent pretences, representations and promises were found principally in the allegation that the scheme devised was "that defendants would and did cause these corporations to sell stock to investors upon the representation that the proceeds therefrom would be used by these corporations for the exploration and development of the mining properties of Extension and Pilot respectively; * * * that defendants * * * would and did conceal from the stockholders * * * information concerning the receipt and expenditure of moneys * * * that defendants would and did appropriate and divert from these corporations a large amount of such corporate moneys to their own use and benefit." Additional portions of the scheme were that the defendants "would and did conceal the fact that defendant Allen was promoter of these corporations or was to receive any part of the stock", that to conceal the true amount of stock issued to them they caused large blocks of stock to be issued to certain named persons "under the pretense that it was in payment of attorneys' fees, but with the arrangement that a portion of such stock or the proceeds from its sale would be turned back to defendants." It was also charged that it was part of the scheme that "defendants, in order to create an appearance of mining activity on the part of these corporations and to increase the market value of defendants' promotion stock of Extension and Pilot, would and did spend a small portion of the funds belonging to these corporations on the mining properties of Extension and Pilot, whereupon, defendants would and did dispose of their promotion stock by selling it on the market to the investing public, without disclosing the fact that large amounts of the funds of these corporations had been appropriated and diverted to defendants' own use and benefit."

The first three counts of the indictment charged offenses under Title 18 U.S.C.A. § 338 [Revised § 1341], relating to the use of mails to defraud, in that the defendants for the purpose of executing this scheme, mailed certain described letters which were delivered at Spokane, Washington. In the next three counts it was charged that this scheme to defraud was designed and used by defendants in the sale of securities by the use of the United States mails in violation of Title 15 U.S.C.A. § 77q, relating to fraud in the sale of securities. The seventh count of the indictment, which was the one upon which appellant was convicted, charged the defendants named with conspiracy to commit the offences described in the first six counts, and alleged sundry overt acts in furtherance of the alleged conspiracy.

Keane and Grismer entered pleas of nolo contendere; Allen entered a plea of not guilty upon which he was tried, and this appeal is taken from the judgment entered upon the verdict of guilty.

There is no question upon the evidence but that extensive frauds were committed in and about the organization and operation of the two corporations mentioned, and that someone devised the schemes to defraud involving all of the fraudulent elements charged in the indictment. Nor does the brief or argument of appellant Allen take any position to the contrary. His position at the trial below, and presented to us upon this appeal is that Allen had no part in any of these schemes; that they were exclusively the enterprises of Keane; that although Allen sometimes discussed the objectives of the two corporations, he did so only because he was interested in seeing a large mining area which included the properties of these two companies developed for the general benefit of the whole community. In general, his contention is that in prosecuting this case against him (in which Keane testified as a witness for the Government), the Government is attempting to throw upon Allen the consequences of the iniquity of Keane. His primary specification of error is based upon his contention that the evidence is insufficient to sustain the verdict.

Wholly apart from the testimony of Keane, and of Grismer, there was much evidence tending to prove active participation

by Allen in the alleged fraudulent enterprise, and in the organization and operation of the two corporations.

Thus it appears that in May, 1945, shortly after Extension was organized, Keane and Allen met Elmer Johnston, a Spokane lawyer in a hotel at Wallace, Idaho, and there discussed with him his proposed employment to prepare an issue of stock of the company for public sale under Regulation A of the Securities and Exchange Commission. In consequence of his employment then arranged, Keane, Allen, Grismer and their engineer, furnished Johnston with the necessary information to enable him to prepare a letter of notification under that regulation and to prepare and file with it a prospectus which Johnston insisted should accompany the letter. Johnston obtained the information from all three of the defendants, and in consequence of what they told him inserted in the prospectus the statement that all proceeds of the proposed public offering would be expended upon the company's mining property. In the course of these negotiations Keane, in Allen's presence, told Johnston that Allen had been enjoined, in some proceeding instituted by the Securities and Exchange Commission, from making use of the mails to sell any securities unless a registration statement was in effect; and that "Mr. Allen would have no active part in the handling of any projects until the injunction had expired."

The testimony of Johnston disclosed that Allen did have an active part at least in planning and projecting the corporation, and other evidence adduced by the Government tended to disclose that while Allen may have intended to create the impression that he was having no active part in the handling of the corporation, he did participate actively in the entire enterprise, and that this was true in respect to Pilot which was organized in like manner later in the same year. Thus Extension's first offering of stock, thus arranged for through Johnston, netted the company $100,000 which was remitted by the underwriting brokers and deposited in the company's bank account. In January, 1946, a second offering of Extension's stock was made which netted the company $78,000.

Throughout this period of time and at least as early as 1943, Keane and Allen together had substantial interests in a mining property near Neihart, Montana, first operated by Montana Leasing Company, a Montana corporation, and later by Lexington Silver-Lead Mines, Inc. Between July 28, 1945 and May 17, 1946, there was diverted from Extension and transferred to Montana Leasing-Lexington Silver, some $113,000. It will be noted this was the greater portion of Extension's entire cash receipts from stock sales. The fact of these diversions was proven by the bank accounts of the various corporations, and by the deposit slips and checks by which the diversions were accomplished.

Notwithstanding such diversions automatically operated to the advantage and benefit of Allen who was, as stated, actively and substantially interested in the Montana Leasing-Lexington Silver enterprise, it is suggested on behalf of Allen that it was not proven that he himself participated in this diversion. There was ample proof that he did so. Thus one Irene Vermillion, secretary to Keane, who was listed with the bank as one of the persons authorized to sign checks on Extension's account, testified that on August 7, 1945, Allen came to the office where she kept the company check book and had her sign in blank and deliver to him two checks from the company check book. Allen told her he would advise her later to whom the checks were made payable, and she then noted on the check stubs Allen's initials. When the checks finally were returned to the bank and cashed, she discovered that one had been dated August 7, 1945, (the day the two blank checks were given to Allen), and made payable to the Delaware Mines Corporation in the sum of $10,000. The other was dated August 28, 1945, and made payable to Montana Leasing Company in the sum of $5000.

The Delaware Mines Corporation was an outfit principally owned by Allen. The $10,000 check was deposited to its account. At the same time it issued three checks disposing of the $10,000. One of these was for $3000 to Montana Leasing Company. Another was for $6000 to Callahan Consolidated Mining, Inc., a concern with which

Allen was connected, and to which Delaware owed money. The third was a check for $1000 to one Hansen, a Wallace attorney. The $3000 check was deposited in the Montana Leasing bank account as was the $5000 check dated August 28, 1945 which Vermillion had signed for Allen in blank on August 7th.

Vermillion's account of this transaction by which the two blank checks were used by Allen to divert Extension funds to Montana Leasing and Delaware, was corroborated by the testimony of a Mrs. French who assisted in preparing the checks in the office of Callahan Consolidated. It was circumstantially confirmed by the fact that the two blank checks had been completed by use of a check protector in the latter office which Allen used as his Wallace headquarters, and by the fact that hotel records and other testimony showed that on August 7, when the blank check incident occurred, Allen was in Wallace, while during the same time Keane was absent on a fishing trip.

Not only did Montana Leasing or Lexington Silver receive these diverted Extension moneys, but after Pilot had completed its first public offering and received funds early in 1946, similar diversions of such Pilot funds to Montana Leasing-Lexington Silver also occurred. The diversions from both companies extended over a period from July 25, 1945, to August 22, 1946. Throughout this period of time Allen was not only part owner of Montana Leasing-Lexington Silver but he was also taking an active part in its management, and it is inconceivable that he did not know that its operations were substantially based upon these embezzled funds. The bank records themselves show that on 20 occasions the moneys diverted to Montana Leasing-Lexington Silver were deposited in its account at the Wallace bank to meet over-drafts in that account. In other words, it is a fair inference that when Montana Leasing was pressed for money it arranged to get the money from Extension or Pilot. That Allen must have known of all this is disclosed by the fact that during the period mentioned—July 19, 1945 to August 19, 1946,—Allen drew checks on Montana Leasing account for an aggregate of $49,327.91.

These checks, which are in evidence, show on their face that a substantial portion of this total amount was drawn for Allen's personal use. A considerable number were made payable to his wife; some were made payable to insurance companies to pay his personal insurance premiums; many were made payable to cash; many, although made payable to various hotels, were apparently for cash also for they were almost invariably for round sums, such as $100, $200, $150, and the like. One check for $2890.30 payable to cash was, according to Allen, written and delivered to the Rocky Mountain Cafe, an eating drinking and gambling place at Meaderville, near Butte, Montana. Keane testified that Allen told him that this was written to pay Allen's gambling losses. Allen denied this and attempted to explain the check as having been written to procure cash to take to the storekeeper at Neihart so that the latter would be able to cash the company's payroll checks. On further cross-examination of Allen, it developed that this money was not in fact used for that purpose. The jury might well infer that if Allen's story was correct, he at any rate kept the money.

Our only reason for thus outlining in such detail the Government's proof of Allen's participation in these diversions, is that counsel for appellant have so earnestly argued that there is a total want of evidence that Allen participated in an admittedly fraudulent scheme. In our view this complaint is without merit.

█ It would serve no useful purpose to outline at such length the additional testimony by which the Government sought to prove Allen's participation in other aspects of the alleged conspiracy. Although the Government was not required to prove Allen's participation in every element of the alleged scheme, we think the evidence was sufficient to do so.

When Pilot was organized and supplied with funds early in 1946, the $100,000 which it received from sales to the investing public was largely diverted in a manner similar to that which took place in respect to the Extension funds. In addition to the diversions to Montana Leasing-Lexington Sil-

ver from Pilot funds, to which we have referred, a diversion of $15,000 was made to Coeur d'Alene Consolidated Silver-Lead Mines, Inc., a company in which Allen had substantial interest, and $1200 was diverted to War Eagle Silver-Lead Mines, Inc., a company owned by Allen, Keane and one Ben Porter. This latter was made through a check drawn by Vermillion on Allen's instructions. The $15,000 diversion was traced through the bank records. The money became a part of a sum deposited in escrow on May 23, 1946 pursuant to a contract made on that day and signed on behalf of Coeur d'Alene Consolidated by Allen as its president.

There was substantial evidence that Allen not only actively promoted Extension and Pilot, but assisted in their management as well. In addition to his negotiations with the attorney Johnston, mentioned above, he personally arranged for the initial issuance to Johnston and another attorney of large blocks of stock and for the return of portions thereof to Keane and Allen. Allen negotiated and arranged for the execution of a contract between another mining company and Extension providing for their common development of underground workings. He interviewed owners of mining properties sought by these companies, and negotiated for their purchase. He gave directions to Vermillion and others who were doing the office work for these companies, and his instructions were accepted and followed by them. He personally paid for photographs and surveys of the companies' mining claims.

Substantial amounts of the promotion stock of these companies found their way into Allen's hands. Of 425,000 shares of Extension stock supposed to be issued for attorney's fees, 60,000 turned up in the name of Allen, or of Allen's wife, in the records of brokers' offices through which they were sold in November and December of 1945. Allen received the proceeds. From this "attorney's fee" stock, 200,000 more shares were sold by Keane and Allen, and the proceeds divided between them. In January, 1946, Allen sold 75,000 additional shares from this same source.

In addition, Allen obtained at least 455,000 shares of the 1,229,700 shares issued to Grismer supposedly for mining claims acquired by Extension on organization. The evidence indicates that Allen and Grismer had an understanding from the beginning that Allen was to have this stock. These shares were sold through various brokerage accounts in the names of Helen Allen (Allen's wife), Helen Jorgenson (his wife's maiden name), B. A. McLean (stenographer in his office), and J. A. Allen. All the accounts belonged to Allen, and these sales alone produced sums in excess of $50,000.

We think the evidence sufficient to warrant the jury's belief that Allen was a full participant in the fraudulent undertaking.

About December 26, 1946, Keane and Allen had a falling-out, and thereafter were in violent disagreement as to the affairs of these companies, and as to who was to blame for their then distressed condition. Asserting that this showed that any conspiracy as between Keane and Allen must have terminated on that date, appellant moved the court to strike from the record all evidence pertaining to transactions occurring subsequent to December 26, 1946.

Had the Government undertaken to prove its case by acts done or declarations made out of court by Keane at times subsequent to the date mentioned, the motion to strike this evidence might well carry weight. But the only evidence to which the motion could have reference was that disclosing sales of promotion stock by Allen after December 26, 1946, and certain exhibits showing the final disposition of the corporate assets. These last consisted of checks for salaries, for taxes, for supplies, and the like. Under no circumstances could they be prejudicial. They were, we think, properly received to round out the picture of what finally happened to these companies.

The other evidence, of Allen's later sales of promotion stock, was clearly properly received for the purpose of showing Allen's earlier acquisition of the stock of

which he was thus undertaking to dispose. We find no error in the receipt of this evidence, or in the court's refusal to strike it, regardless of whether the conspiracy did, or did not, end on the date mentioned.

The court instructed the jury "that the testimony of neither Keane or Grismer is necessary to the Government's case against the defendant Allen providing you are convinced beyond all reasonable doubt of the guilt of the defendant Allen from the other testimony, including the exhibits, facts and circumstances proved in the case to your satisfaction beyond all reasonable doubt." This is assigned as error.

The jury was instructed that it was the exclusive judge of the facts, of the weight to be given the testimony of witnesses, and of the inferences to be drawn from the facts proved. Such comment as the court made in the portion of the instructions quoted above, was within the traditional prerogative of a Federal judge.

■ The testimony respecting Allen and the blank check incident was not even denied. The fact of the diversion of funds in a manner calculated to work to his advantage, his personal use of those funds, and the extent of his sales of promotion stock were established by documentary evidence which was practically incontrovertible. While the evidence of guilty intent, of a wilful participation in an unlawful conspiracy was circumstantial, it was sufficient. This, together with the extensive evidence of Allen's participation in the alleged conspiracy, all of it from sources other than the testimony of Keane and Grismer, which we have reviewed above, sufficiently discloses that in our opinion the court's comment was a correct one and we find no error in its instruction.

Twenty-four hours after the case had gone to the jury the jurors requested additional instructions, as the foreman put it, on "whether count 1 would include all the other counts", or as another juror stated: "It seems that with the original charge in count 1, that that would carry through in all the other six counts". Thereupon the court gave the jury additional instructions as to what must be proven under the various counts, which served to narrow and restrict the proof required for conviction under the first six counts.

Appellant contends that this action of the court was error, not because of any assertion that the further instructions did not correctly state the law, but for the reason, first, that the questions asked by the jury did not call for the instructions given, and second, that they would "serve only to further perplex and to confuse the jury", and "tend to accentuate the particular matters to which the additional instructions relate."

■■ We think the additional instructions in no manner tended to prejudice the defendant; rather, they would appear to have been to his advantage. But the giving of additional instructions has always been held to be within the discretion of the trial court. Allis v. United States, 155 U.S. 117, 15 S.Ct. 36, 39 L.Ed. 91; Charlton v. Kelly, 9 Cir., 156 F. 433. We find no error here.

■ Appellant argues that the verdicts of not guilty on counts 1 to 6, and of guilty on the seventh count are inconsistent. We need not consider whether they were or not, for if they were, this is no ground for reversal. Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356; Catrino v. United States, 9 Cir., 176 F.2d 884.

■ Finally, it is said that we should not sustain the conviction under the conspiracy charge, since prosecution under the counts charging the substantive offenses would have been adequate. The argument is that the conspiracy statute has been abused, and the concurring opinion of Mr. Justice Jackson in Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790, is cited. We think it sufficient to say that we find no evidence of any misuse of the statute in this case. So long as this statute remains law, this argument against use of a conspiracy charge is not one properly addressed to us.

The judgment is affirmed.