Commonwealth *v.* Newman, Appellant.

Argued September 13, 1966. Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, JACOBS, HOFFMAN, and SPAULDING, JJ.

36

*Arthur Levy,* with him *McClenachan, Blumberg & Levy,* for appellant.

*Vram Nedurian, Jr.,* Assistant District Attorney, with him *Ralph B. D'Iorio,* Assistant District Attorney, *Paul R. Sand,* First Assistant District Attorney, and *Jacques H. Fox,* District Attorney, for Commonwealth, appellee.

OPINION BY ERVIN, P. J., June 16, 1967:

The appellant, Henderson Newman, was convicted on a lottery charge and has appealed from his sentence on that conviction. He argues that the search and seizure of gambling paraphernalia from his home violated his constitutional privilege against unreasonable search and seizure guaranteed by the Fourth Amendment to the Federal Constitution.

This subject has been before the courts many times and the most recent utterance on the subject is that expressed by Mr. Justice COHEN for the majority in the case of *Com. v. Ametrane,* 422 Pa. 83, 221 A. 2d 296, wherein he stated, at pages 86 and 87, the following: "In Ker v. California, 374 U.S. 23 (1963), the Court held that the reasonableness of a state search was to be determined ultimately by the application of federal constitutional standards as expressed in the Fourth Amendment and the decisions of the Court applying that amendment. Yet, even in Ker, the Court recognized the right of the State to develop rules governing

arrests and searches and seizures. Preserving this right in the state, Mr. Justice CLARK stated: 'We reiterate that the reasonableness of a search is in the first instance a substantive determination to be made by the trial court from the facts and circumstances of the case and in the light of the "fundamental criteria" laid down by the Fourth Amendment and in opinions of this Court applying that Amendment. Findings of reasonableness, of course, are respected only insofar as consistent with federal constitutional guarantees. . . . The States are not thereby precluded from developing workable rules governing arrests, searches and seizures to meet "the practical demands of effective criminal investigation and law enforcement" in the States, provided that those rules do not violate the constitutional proscription of unreasonable searches and seizures and the concomitant command that evidence so seized is inadmissible against one who has standing to complain. . . . Such a standard implies no derogation of uniformity in applying federal constitutional guarantees but is only a recognition that conditions and circumstances vary just as do investigative and enforcement techniques.' 374 U.S. at 33-34.

"Such a recognition is especially pertinent to effective law enforcement against narcotics and gambling violations, where the possibility that evidence may be destroyed is particularly acute. Indeed, it is this very possibility which should allow state law enforcement officers to adopt techniques to suit the concrete situation. Blakey, The Rule of Announcement and Unlawful Entry: Miller v. United States and Ker v. California, 112 U. Pa. L. Rev. 499, 557 (1964)."

We must, therefore, now consider the evidence in this case to determine whether what the officers did, under all the surrounding circumstances, was unreasonable.

Three detectives of the vice squad of the district attorney's office testified. The record reveals that they

had been members of the vice squad for a considerable period of time and that after obtaining a search warrant for the property, a body warrant for the defendant and a search warrant for his person from a magistrate, they proceeded to the defendant's home, a small two-story dwelling located in the City of Chester, Pennsylvania. Detective John MacCrory testified: "When we arrived at 721 West Mary I banged on the door and announced that we were the police. Q. What voice did you use, do you recall? A. It was loud enough for somebody inside to hear. I know it was that loud. Q. And then did you wait for the door to be opened? A. Yes, sir. Q. And was it opened? A. No. Q. Then what did you do? A. With that I ordered Detective Lee, who was carrying a sledge, to hit the lock. Q. And how long did it take Detective Lee to open the door? A. Not very long. We were in in nothing flat." He testified that when the officers got in and when he opened the door to the dining room, he noticed a man coming down the steps from upstairs, that man being the defendant, Henderson Newman. He asked him if he was Mr. Newman and upon receiving an affirmative reply, told him that he had search warrants for his person and also for the house and that he was charged with lottery. The defendant then said: "Go ahead and search."

Detective James C. Stewart testified that he had made surveillance of the property on November 4 and November 7, 1964 and described the people that he saw going into the house on those occasions. He also testified that on the day of the raid, when he got out of the car in front of the defendant's house he looked up to the second floor window and saw a man walking past the windows. He also testified that he then walked to the front door and that Detectives Lee and MacCrory were there "hollering Police, and knocking on the door with their hands."

Detective Joseph Lee testified as to his surveillance of the premises on November 5 between 10 a.m. and 1 p.m., and on November 12 and described the people he saw entering and leaving the house on those days. As to the day of the raid, he testified in direct examination as follows: "Well, we got out of the car, I was in company with Detective MacCrory. We knocked on the door. A few minutes after he announced Police I announced it, we got no response, so I hit the door once with a sledgehammer and it flew open." On cross-examination he testified as follows: "Q. Now you stated that you and the other detectives approached the house, and I believe you said that one of the other officers knocked, announced Police, and then after a few minutes you announced Police and there was no answer and the door was broken into. You say after a few minutes you announced Police. Do you literally mean after a few minutes, Mr. Lee? A. No, it was a few seconds. I would say maybe within 20 seconds or so after the first announcement."

The jury having found a verdict against the defendant, the evidence and the inferences therefrom must be considered most strongly in favor of the Commonwealth: *Com. v. Yobbagy*, 410 Pa. 172, 176, 188 A. 2d 750.

It is a well established fact that defendants in gambling and narcotics cases on many occasions have destroyed the evidence before the raiding officers could take it. This Court has had a number of cases where gambling paraphernalia or narcotics have been burned, thrown into a toilet or hidden out of a window on a porch roof. We have even had cases where defendants have swallowed numbers slips. The record shows that the detectives in this case were qualified experts in this field and they were undoubtedly aware of such practices. We must also take into consideration the fact that a man was observed at the front window on the

second floor and that he, in all likelihood, had seen and was aware of the fact that the car had stopped in front of the premises and that three detectives, after alighting from the cars, passed therefrom across the sidewalk to his front door. It is also a fact, probably well known to the detectives in this case, that they were well known to the local gamblers. The jury could well have found from all the surrounding circumstances that the defendant knew of the presence of the county detectives before they even reached his front door and that an announcement of their identity and purpose would have added nothing to the knowledge already possessed by the defendant.

Taking all of these circumstances into consideration, was it unreasonable for the officers to enter the defendant's home as they did and to make the search which he invited them to do. We do not believe that it was unreasonable and that the admission of the gambling paraphernalia into evidence did not violate any constitutional privileges of the defendant.

A second question was raised on this appeal as to whether the search warrant issued by the magistrate was upon probable cause. We have reviewed the evidence in this connection and believe that it was issued on probable cause. In the present case the detective, in his affidavit before the magistrate, stated that he believed that there were certain books, papers and other paraphernalia used for the purpose of recording or registering bets, or wagers including what is commonly called lottery, traffic in lottery and bookmaking, and he gave his grounds for this belief. He stated that complaints and information were received from persons of reliable and good reputation, which he had reason to believe to be true, and that they had been told this was a numbers drop and through the detectives own surveillance they observed considerable traffic going in and out of the house on four different dates

during the hours when numbers would be dropped. He also stated they had information received from reliable undercover agents to support his belief that the premises were being used for the illegal purpose of conducting a lottery therein. We are of the opinion that the warrant was issued on probable cause.

The judgment of sentence is affirmed and the defendant is directed to appear in the court below at such time as he may be there called, and that he be by that court committed until he has complied with the sentence, or any part of it which had not been performed at the time the appeal was made a supersedeas.

DISSENTING OPINION BY SPAULDING, J.:

Appellant contends that the officers' failure to announce their purpose prior to forceful entry rendered the warrants illegal and the evidence seized inadmissible.[1]

The first case in which the Supreme Court squarely considered the question of announcement and unlawful entry was *Miller v. United States*, 357 U.S. 301, 78 S. Ct. 1190 (1958). William Miller and Bessie Byrd were dealers in narcotics, and Byrd's brother was one of their peddlers. Following the arrest of Byrd's brother, police officers went to Byrd's and Miller's Washington apartment to arrest them. One officer knocked and, upon the inquiry from within—"Who's there?"—replied in a low voice, "Police". Miller then opened the door slightly, saw the officers, and attempted to close it. One officer immediately grabbed the door and forced it open. Once inside, Miller and Byrd were arrested and marked informant money was found.

The Court concluded the validity of Miller's arrest was determined "by reference to the law of the District

---

[1] Evidence obtained by a search or seizure in violation of Constitutional standards is inadmissible in state courts. *Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684 (1961).

of Columbia." The criteria of the local rule of arrests were found to be "identical with those embodied in 18 U.S.A. §3109, which deals with entry to execute a search warrant."[2] Id. at 306.

According to Justice BRENNAN, the local rule seemed "to require notice in the form of an express announcement by the officers of their purpose for demanding admission." He noted the burden of making an express announcement was "certainly slight" and that "a few more words by the officers would have satisfied the requirement in this case." He concluded that under the circumstances in *Miller,* the absence of announcement of purpose made the entry and arrest unlawful and the evidence seized illegal.

The question of adequate announcement was confronted again in *Ker v. California,* 374 U.S. 23, 83 S. Ct. 1623 (1963). Having probable cause to arrest Ker for possession of narcotics, four California police officers used a passkey to enter his apartment. Ker was then arrested and marijuana found in the subsequent search. The Court sustained the conviction. The opinion first considered the proper standard applicable to the states under the Fourth and Fourteenth Amendments, an issue not decided in *Mapp.* The Court said the reasonableness of a search must be made according to the "fundamental criteria" of the Fourth Amendment but concluded: "The States are not thereby precluded from developing workable rules governing arrests, searches and seizures to meet 'the practical demands of effective criminal investigation and law enforcement' in the States, provided that those rules do not violate the constitutional proscription of unreasonable searches and seizures and the concomitant com-

---

[2] Section 3109 provides: "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance . . . ."

mand that evidence so seized is inadmissible against one who has standing to complain".

Regarding the method of entry, the Court noted the legality of arrests by state officers for Federal offenses had long been determined by reference to state law, when it is consistent with the Federal Constitution and concluded that "a fortiori, the lawfulness of [the] arrests by state officers . . . [was] to be determined by California law." Section 844 of the California Penal Code permits forceful entry by officers into a dwelling to make an arrest after demanding admittance and explaining their purpose.[3]  In applying §844, the Court said: "Admittedly the officers did not comply with the terms of this statute since they entered quietly and without announcement, in order to prevent the destruction of contraband."  The Court noted, however, that "the criteria under California law clearly include an exception to the notice requirement where exigent circumstances are present" and concluded ". . . justification for the officers' failure to give notice [was] uniquely present.  In addition to the officers' belief that Ker was in possession of narcotics, which could be quickly and easily destroyed, Ker's furtive conduct in eluding them shortly before the arrest was ground for the belief that he might well have been expecting the police.  We therefore hold that in the particular circumstances of this case the officers' method of entry, sanctioned by the law of California, was not unreasonable under the standards of the Fourth Amendment as

---

[3] Section 844 provides:  "To make an arrest, . . . in all cases a peace officer, may break open the door or window of the house in which the person to be arrested is, or in which . . . [he has] reasonable grounds for believing him to be, after having demanded admittance and explained the purpose for which admittance is desired."

44

applied to the States through the Fourteenth Amendment." Id. at 39-41.[4]

In the case at bar, the legality of the entry is to be judged according to Pennsylvania standards consistent with Fourth Amendment guarantees. Although a majority of states have specific announcement requirements in statutes substantially similar to California's §844 and Federal §3109, Pennsylvania does not.

As recently as 1965, President Judge ERVIN, speaking for this Court, stated: "It is not clear that Pennsylvania has a rule of announcement at all. See Com. v. Manduchi, 203 Pa. Superior Ct. 373, 198 A. 2d 613; but see United States ex rel. Manduchi v. Tracy, 233 F. Supp. 423 . . ." Commonwealth v. Ametrane, 205 Pa. Superior Ct. 567, 574, 210 A. 2d 902 (1965).[5] After exhausting his state remedies, Manduchi initiated a Federal habeas corpus proceeding, United States ex rel. Manduchi v. Tracy, 233 F. Supp. 423 (E.D. Pa. 1964). In that case, Lancaster city detectives proceeded to pe-

---

[4] Only four Justices took this view. Justice HARLAN concurred in the result. Justice BRENNAN and three other Justices believed the "federal requirement of reasonableness contained in the Fourth Amendment was violated . . . because of the unannounced intrusion of the arresting officers . . . ." He stated that a search warrant could be validly executed without an announcement of authority and purpose: "(1) where the persons within already know of the officers' authority and purpose, or (2) where the officers are justified in the belief that persons within are in imminent peril of bodily harm, or (3) where those within, made aware of the presence of someone outside (because, for example, there has been a knock at the door), are then engaged in activity which justifies the officers in the belief that an escape or the destruction of evidence is being attempted."

[5] The late Judge FLOOD earlier said: "We find no Pennsylvania appellate cases which discuss or determine the circumstances under which police officers armed with a warrant may break into a private dwelling place without first announcing their purpose and giving the occupants a chance to admit them." Commonwealth v. Manduchi, 203 Pa. Superior Ct. 373, 375, 198 A. 2d 613 (1964). (Allocatur denied 203 Pa. Superior Ct. xxxiii).

titioner's second floor apartment, armed with a search warrant for bookmaking equipment. The first officer knocked and heard a " 'scuffling noise' inside the apartment (the noise was never more precisely described)." Id. at 425. Without announcing his authority and purpose and without waiting for a response, he broke open the door with a sledge hammer. Simultaneously, two other detectives entered by breaking a second door.

In deciding whether the entry "violated constitutional safeguards against unreasonable search and seizure," the District court concluded: "Mapp did not furnish a definitive answer to the question whether a federal or state standard was to be applied in determining the reasonableness of a search, . . . but the more recent case of Ker v. California . . . did. *The standard to be applied is federal . . . [In Ker] the problem was regarded as one of constitutional dimension.*" Id. at 425, 426. (Emphasis added.) The Court granted the habeas petition and ordered a new trial.

On appeal, the Court of Appeals for the Third Circuit affirmed, stressing that ". . . the evidence . . . introduced at the Manduchi trial was not of the urgency that called for the immediate action of forcing entry without making known who was at the door and their purpose and of allowing the occupants the opportunity of opening the door peaceably."[6]

Remaining doubt as to the existence of an announcement rule in Pennsylvania was dispelled in *Commonwealth v. Ametrane*, 422 Pa. 83, 221 A. 2d 296 (1966), where the Supreme Court of Pennsylvania recognized the authority of *United States ex rel. Manduchi v. Tracy*, supra, but distinguished the case on its facts. In *Ametrane*, two county detectives with search warrants and an arrest warrant, proceeded to defendant's

---

[6] *United States ex rel. Manduchi v. Tracy*, 350 F. 2d 658, 662 (3d Cir. 1965), cert. denied, 382 U.S. 943 (1965).

home. "As they approached the property, *the detectives noticed defendant sitting at a window and observed him look in their direction.*" Id. at 85. (Emphasis added.) One of the detectives knocked on the door, waited approximately one minute without response, and knocked again. Still hearing nothing, the officers started to apply a crowbar when the defendant cried out, "Don't break my door. I will let you in." Defendant then admitted the detectives who identified themselves, read the warrants and began their search. A motion to suppress was dismissed and defendant convicted. The Superior Court affirmed the sentences and the Supreme Court also affirmed, concluding: "The conduct of the county detectives . . . did not violate the safeguards of the Fourth Amendment." Id. at 87. In so deciding, the Court emphasized: "The testimony reveals that they were observed by defendant as they approached his door; that there was an interval of silence which lasted one minute following their first knock at the door; and that even before they were able to apply the crowbar the defendant opened the door. Under these circumstances, it is obvious that defendant knew their identity and purpose without a formal announcement. Furthermore, there was absent here the 'forceful entry' which confronted the Court in Ker. . . . Even the dissenters in Ker recognized that exceptions to the rule of announcement exist, inter alia, where the persons within already know of the officers' authority and purpose or 'where those within, made aware of the presence of someone outside (because, for example, there has been a knock at the door), are then engaged in activity which justifies the officers in the belief that an escape or the destruction of evidence is being attempted.' 374 U.S. at 47. Certainly, if the instant case does not fall within the former exception, then the lengthy silence maintained by defendant after observing the officers and

hearing their knock would justify the application of the latter exception to the present matter." Id. at 87-8.[7]

In the instant case, Detectives MacCrory, Lee, Stewart, and Gibbons arrived at Newman's home simultaneously by car. As the first three approached the front, Gibbons "covered the back." MacCrory testified he was the first to reach the door. According to him, he knocked, announced they were police, and waited for the door to open. He then ordered Lee, who was carrying a sledge hammer, to break the lock. He stated that it was not "very long" before the door was broken down and that: "We were in in nothing flat." Lee said: ". . . after he [MacCrory] announced police I announced it, we got no response, so I hit the door once with a sledge hammer and it flew open." According to Lee, their entry "was a few seconds. . . . maybe within 20 seconds . . . after the first announcement." Stewart testified: "I was the last man out of the car and I looked upstairs to the bedroom and I saw a man walking past the front window, the front bedroom." When asked: "Did you see whether that man was looking out or not?" he replied: "No, I couldn't tell." MacCrory and Lee were unaware of Stewart's observation. Stewart testified that by the time he reached the door, they "were getting ready to go into the building" and he did not communicate this observation to them. I, therefore, cannot agree with the majority that Newman "in all likelihood had seen and was aware of the fact that the car had stopped in front of the premises and that three detectives . . . passed therefrom across the sidewalk to his front door."

Unlike *Ametrane,* there is no indication that appellant knew of or could anticipate the officers' arrival. The evidence shows no probability of peril to those in-

---

[7] Justice ROBERTS concurred in the result but expressed no view regarding the announcement rule because there was no "breaking". Justices MUSMANNO and EAGEN dissented.

48

side or to the officers themselves and the planned presence of officers at both doors made an attempted escape highly improbable. There is no testimony that any of the officers believed evidence was being or might be destroyed if entry were delayed.

I would reverse and grant a new trial.

I dissent.

HOFFMAN, J., joins in this dissent.