Helen A. **DAVENPORT**, Appellant,

v.

**UNITED STATES of America,** Appellee.

No. 15689.

United States Court of Appeals Ninth Circuit.

Oct. 22, 1958.

Rehearing Denied Dec. 5, 1958.

David M. Spiegel, Portland, Or., for appellant.

C. E. Luckey, U. S. Atty., Robert R. Carney, Asst. U. S. Atty., Portland, Or., for appellee.

Before HEALY, FEE, and HAMLIN, Circuit Judges.

HAMLIN, Circuit Judge.

Appellant, Helen A. Davenport, appeals from her conviction of the crime of conspiracy (Title 18 U.S.C. § 371) as set out in Count XIII of an indictment which was tried in the United States District Court for the District of Oregon. In this count of the indictment appellant was charged, with eight other persons, with the crime of conspiracy to violate Section 1341 Title 18 United States Code (using the mails to defraud) and Section 77q(a) Title 15 U.S.C.A. (using the mails in a scheme to defraud in the sale of securities in interstate commerce).

All of these nine defendants, except the appellant and one other, named Williams (who was later dismissed because of illness), were charged in the preceding twelve counts of the indictment with various substantive offenses which were alleged to be violations of § 1341 Title 18 and § 77q(a) Title 15 U.S.C.A. Count XIII, charging conspiracy, realleged and incorporated therein the first twelve counts of the indictment and designated them as overt acts done in pursuance of and to effect the objects of the conspiracy, and alleged in addition 28 other overt acts. In four of said overt acts, appellant was named.[1] In Count I of the indictment, seven defendants (excluding appellant and Williams) were charged in great detail with having devised a scheme to defraud and to obtain money and property by selling to purchasers for $1000 each memberships in Mt. Hood Hardboard and Plywood Cooperative, herein called Mt. Hood, by representing among other things that purchasers of said memberships would obtain continuous employment and job security in a large modern sawmill, plywood, and hardboard plant to be erected and owned and operated by the members thereof on a cooperative plan. Proper allegations were contained therein, alleging the falsity of the various representations, that they were made with the knowledge of the falsity and with intent to defraud. Finally, in said count, it was alleged that said seven defendants, for the purpose of executing the aforesaid scheme and device, "caused to be delivered by United States mails a certificate of membership in Mt. Hood" to a named individual.

Counts II to VII of the indictment, inclusive, after incorporating therein the detailed allegations of Count I, charged the similar delivery of certificates of membership to other named individuals. Counts VIII to XII of the indictment, after incorporating therein the detailed allegations of Count I, charged violations of § 77q(a) Title 15 U.S.C.A. (fraud in the sale of securities) by delivering checks and membership certificates

---

1. "Count XIII

\* \* \* \* \*

"7. On or about October 1, 1954, at Portland, Oregon, defendant Helen A. Davenport signed a contract as president of The Davenport Corporation with Mt. Hood Hardboard and Plywood Cooperative providing for payment of a fee to The Davenport Corporation of 10% of the total amount received from the sale of memberships in Mt. Hood Hardboard and Plywood Cooperative.

\* \* \* \* \*

"12. On or about December 7, 1954, at Portland, Oregon, defendant Edgar Robert Errion obtained a check from Mt. Hood Hardboard and Plywood Cooperative payable to The Davenport Corporation in the amount of $8,000.00, and trans-

mitted said check to defendant Helen A. Davenport.

"13. On or about November 27, 1954, at Portland, Oregon, defendant Edgar Robert Errion obtained a check from Mt. Hood Hardboard and Plywood Cooperative payable to The Davenport Corporation in the amount of $5,000.00, and transmitted said check to defendant Helen A. Davenport.

"14. On or about January 13, 1955, at Portland, Oregon, defendant Edgar Robert Errion obtained a check from Mt. Hood Hardboard and Plywood Cooperative payable to The Davenport Corporation in the amount of $6,500.00, and mitted said check to defendant Helen A. Davenport."

594

through the United States mails to other named individuals.

Appellant relies upon six specifications of error. We shall consider them generally in the order set out in appellant's brief.

Assignments of Error No. 1 and No. 1 (a) make the contention that the indictment fails to state facts sufficient to charge the appellant with a crime, and that the evidence that could be produced under the indictment was necessarily irrelevant to any question of appellant's guilt or innocence of any crime, because of the limitations of proof imposed by its allegations.

The allegations of Count XIII, which charges the appellant and the eight other defendants with the crime of conspiracy, § 371 Title 18 U.S.C., appears to be in the usual form.

It alleges that the nine defendants did "conspire, combine, confederate and agree with each other to commit * * violations of § 1341 Title 18 U.S.C. by using * * * the mails of the United States for the purpose of executing the scheme and artifice to defraud and to obtain money and property from purchasers of memberships in Mt. Hood Hardboard and Plywood Cooperative as described in the first count of this indictment, which is here and now realleged and incorporated by reference;" and to commit "Violations of § 77q(a) Title 15 U.S.C. by employing said scheme and artifice to defraud * * * in the sale of memberships in Mt. Hood * * by the use of the United States mails, all as described in the preceding counts of this indictment and hereby incorporated by reference; * * *." It is then alleged that all of the acts of the defendants as described in Counts I to XII are overt acts done by said defendants in pursuance of and to effect the objects of said conspiracy; and it then proceeds to allege 28 additional overt acts, in four of which the appellant, Helen A. Davenport, is involved and named, as we have seen (Footnote 1). Similar forms of indictment have been frequently upheld. Nemec v. United States, 9 Cir., 1949,

178 F.2d 656; Allen v. United States, 9 Cir., 1951, 186 F.2d 439, certiorari denied 341 U.S. 948, 71 S.Ct. 1015, 95 L.Ed. 1372; Donaldson v. United States, 9 Cir., 1957, 248 F.2d 364.

Appellant, it should be pointed out, filed no motion as provided for under Rule 12(b) (2) and (3), Federal Rules of Criminal Procedure, 18 U.S.C., attacking the indictment prior to trial, nor did she protest that the indictment was not sufficiently clear at that time.

■ Appellant seems to argue that because she was not charged with any offenses in the first twelve counts of the indictment that she was therefore acquitted of those charges and that proof of the facts alleged therein can not be used as establishing overt acts of the conspirators. This is not true. We hold that the indictment sufficiently charged the defendant with a crime. Alexander v. United States, 8 Cir., 1938, 95 F.2d 873, certiorari denied 305 U.S. 637, 59 S.Ct. 99, 83 L.Ed. 409; United States v. Cohen, 2 Cir., 1944, 145 F.2d 82, certiorari denied 323 U.S. 799, 65 S.Ct. 553, 89 L.Ed. 637; Allen v. United States, supra; Shayne v. United States, 9 Cir., 1958, 255 F.2d 739.

In Assignment of Error No. 2, appellant contends that she was prejudiced by not having a separate trial. A motion for severance was filed by the defendant prior to trial "upon the ground and for the reason that she would be prejudiced by remaining joined as a co-defendant". This motion was denied by the trial Court.

■ This motion, of course, is addressed to the discretion of the District Judge. Such a motion is rarely granted. It was stated in Dowdy v. United States, 4 Cir., 1931, 46 F.2d 417, at page 421, "Where two or more defendants are indicted for a joint transaction, it is inadvisable to split up the case into many parts for separate trials, in the absence of very strong and cogent reason therefor. This is especially true in conspiracy charges, from the very nature of the case." Shockley v. United States, 9 Cir., 1948, 166 F.2d 704, certiorari denied

334 U.S. 850, 68 S.Ct. 1502, 92 L.Ed. 1773; United States v. Lebron, 2 Cir., 1955, 222 F.2d 531.

As Judge Augustus Hand aptly said in United States v. Fradkin, 2 Cir., 1935, 81 F.2d 56, 59 (conspiracy to use the mails to defraud):

> "A man takes some risk in choosing his associates and, if he is hailed into court with them, must ordinarily rely on the fairness and ability of the jury to separate the sheep from the goats."

■ An examination of the record indicates that the District Court carefully explained to the jury the position of the appellant and the fact that she was only charged in Count XIII of the indictment and not charged with any other crime set forth in the first twelve counts of the indictment. We see no reason to interfere with the trial Court's discretion in this matter, as we find that no prejudice was suffered by the appellant. That the jury carefully distinguished between the charges against the various defendants is indicated by the fact that one of the defendants—Martin—was acquitted, while the other defendants who had not pleaded guilty were convicted.

In Assignment of Error No. 3, appellant complains of the giving of an instruction by the Court, which is set out below.[2]

■ No specific exception was taken to this instruction by appellant as required by Rule 30 of the Federal Rules of Criminal Procedure. Therefore appellant can not complain of it. However, we have examined the instructions given by the Court and find no error therein.

Assignment of Error No. 4 will be discussed in detail below.

Assignment of Error No. 5 was that the Court erred in informing the jury that the defendant Errion had pleaded guilty. It was apparently the contention of all of the defendants on trial that Mr. Errion was the culprit who was responsible for all of the criminal activities. The record shows that attempts were made during the trial by the defendants to place the blame upon Mr. Errion while attempting to show that they themselves were not guilty of the charges against them.

During the third day of the trial when some reference to Mr. Errion had been made, the Court stated, "We are not going to try Mr. Errion here any longer. He has pleaded guilty. He is safely in jail. I think we have all we can do to try the other six defendants that are here without discussing Mr. Errion any further." A few moments later the Court made another statement involving the fact that Mr. Errion and Mr. Montgomery had pleaded guilty. This statement is set forth below.[3]

2. "There was evidence in this case that one or more of the defendants named in the indictment organized the Mt. Hood Hardboard and Plywood Cooperative, as well as certain other cooperatives and corporations, and that they used these corporations as well as existing corporations, such as the Davenport Corporation, for the purpose of siphoning off money paid in by the purchasers of memberships in the Mt. Hood Cooperative. If you find that the Government has proved this scheme to defraud as to one or more of these defendants, the first essential element in the indictment will have been satisfied * * *. You will next consider which defendants, if any participated therein. If you find that one or more of the defendants devised or participated in a scheme to defraud by knowingly and willfully assisting in the

setting up of corporations or the use of existing corporations to permit him or one or more persons to siphon off money paid in by the purchasers of memberships in the Mt. Hood Cooperative, then that defendant is chargeable with participation in the scheme, even though he himself, never made any representations of any kind to a prospective purchaser of memberships * * * and likewise he may be chargeable even though he himself did not personally benefit from it, but if he participated and such participation permitted or assisted another person to defraud the co-op or the members."

3. "Ladies and Gentlemen, I want to make one thing clear to you, as I will in the instructions: These people that are on trial, these seven defendants are the

Later, during the Court's instructions, the Court instructed the jury properly upon that subject.[4]

No objection was made by anyone concerning the Court's reference to the pleas of guilty by Errion and Montgomery, nor was any exception taken of the Court's instruction, or any instruction requested by the appellant to be given by the Court upon this subject.

■ It was inevitable that during the testimony references would be made by the witnesses to the activities of Mr. Errion and Mr. Montgomery, and we see no error in the Court's informing the jury of the fact that these two persons had pleaded guilty. Nemec v. United States, supra; Holmes v. United States, 8 Cir., 1943, 134 F.2d 125, certiorari denied 319 U.S. 776, 63 S.Ct. 1434, 87 L.Ed. 1722; United States v. Dewinsky, D.C.N.J.1941, 41 F.Supp. 149.

In appellant's Assignment of Error No. 4 she complains that the evidence is insufficient to sustain her conviction, and in Assignment of Error No. 6 appellant complains that the Court erred in denying her motion for a judgment of acquittal. We shall consider these two assignments of error together.

The evidence disclosed that the appellant was a business woman of considerable experience, having operated a real estate, money loaning, estate management, and insurance business. She had known Errion for over 20 years; had, with her husband, provided him with some moneys to promote an oyster bed operation which was unsuccessful. She knew he had fraud judgments against him, which made it inadvisable for him to operate openly. She had received from Errion an assignment of an annuity from one of Errion's fraud victims, which she later gave back. She had been connected in at least two transactions with Errion which resulted in Errion's victims obtaining large judgments against him for his fraudulent practices.

The scheme charged in the indictment, which was amply proved, was carried out by means of newspaper advertisements, sales literature, and by salesmen. One representation was that if a person bought a membership for $1000 in Mt. Hood Hardboard and Plywood Co-operative he would receive "job security". He also would be guaranteed employment in a modern plywood and hardboard plant costing from three to five million dollars which was to be erected at once. Representations were also made that finances to construct the plant had been arranged for and that investors' funds would be held and *used only for working capital*. Representations were also made that an adequate supply of timber was assured.

The evidence clearly established the falsity of these representations.

Appellant's connection with this scheme may be briefly summarized.

A paragraph of the indictment referring to the Davenport Corporation was as follows:

"As a further part of said scheme and artifice, said defendants would and did cause said Mt. Hood to enter

---

only ones on trial. They are the only ones on trial, and you will be called upon to determine the guilt or innocence of these seven persons and no other persons. Mr. Errion is not involved in this case. I mean you will not have to determine whether Mr. Errion is guilty or not guilty. He has already pleaded guilty. The same is true of Mr. Montgomery."

4. "As I told you at the commencement of this trial, Edgar Robert Errion and Roland L. Montgomery have entered pleas of guilty to certain counts in the indictment. The fact that they entered pleas does not necessarily mean that they alone are responsible for the crimes charged in the indictments, nor does it necessarily mean that each or any of the other defendants is guilty with them. In fact, it is no evidence of their guilt or innocence or that a crime was committed. (That is, the pleas of Errion and Montgomery are no evidence of the guilt of any of the defendants nor evidence that a crime was committed.) The guilt or innocence of the defendants who are on trial must be determined by you solely by the evidence introduced at this trial."

into a contract with The Davenport Corporation, a corporation controlled by defendants, as a means by which said Davenport Corporation would and did claim and receive and convert to the use and benefit of defendants a large portion of the moneys which had been received from said purchasers of Mt. Hood memberships; and as a further part of said scheme and artifice and in order to make secret profits for themselves, said defendants would and did cause agents, employees, and officers of Mt. Hood to procure options in the name of said Davenport Corporation on real estate which was to be purchased by Mt. Hood, and would and did obtain funds from Mt. Hood with which to purchase said real estate in the name of said Davenport Corporation, and would and did then resell said real estate to Mt. Hood at great profit to said Davenport Corporation and defendants."

The evidence disclosed that appellant was the owner of all of the shares of stock of Davenport Corporation with the exception of two qualifying shares. It further showed that at the original incorporators' meeting, where only eight persons were present, a contract was entered into between Mt. Hood and Davenport Corporation whereby Mt. Hood was to pay to Davenport Corporation a 10% fee of money received from memberships for organization and assistance in financing. This contract also provided that these duties were to be performed by the Davenport Corporation with "due diligence".

The words "Copyrighted by The Davenport Corporation, Portland, Oregon" were printed on sales literature, on aplications for membership forms, and on the membership certificates. The evidence further showed that over a period of time some $80,000 was received by the Davenport Corporation. These funds were generally received by means of checks made payable to the Davenport Corporation and deposited in its bank account. There was ample proof of the

heretofore set out four overt acts referring to appellant.

Concerning the real estate transaction referred to in the indictment, it appears that options were taken for the purchase of this land in the name of Davenport Corporation at certain prices. Thereafter, the Mt. Hood corporation supplied funds for the purchase of the property at prices considerably in excess of the prices at which options had been obtaind by Davenport Corporation. The result was that a profit on the transaction by Davenport Corporation was realized in the claimed amount of some $25,000.

Approximately $550,000 was received by Mt. Hood from the sale of "memberships". As indicated above, under the representations made to the prospective members, *this money was to be held and used only for a working capital.* However, some $250,000 of this money was used for other purposes. A part of this $250,000 included the 10% fee paid to the Davenport Corporation under the written contract.

In order to counteract the effect of this and other evidence, the appellant took the witness stand. She testified that she had no knowledge of any of the nefarious schemes of Errion and his associates. She contended that Errion came to her and suggested that the Davenport Corporation be used to handle certain funds to be received from the sale of memberships in Mt. Hood. According to the plan as testified to by her, Errion was to receive the 10% provided for in the contract to the Davenport Corporation after this money had been first deposited in a bank account of that corporation, and that then the Davenport Corporation was to pay the money over to Errion. She testified that for this service Errion agreed that appellant was to get 10% of Errion's 10%, or 1% of the total received.

She testified that on numerous occasions Errion gave her checks payable to Davenport Corporation, that she went to the bank with him, deposited the checks in the account of the Davenport

Corporation, then bought cashier's checks payable to Davenport Corporation and endorsed these checks and presented them to Errion. She testified that this banking arrangement was made so that Errion would be protected against an outstanding judgment against him. She later testified, however, that this judgment, which she claimed was the reason for the arrangement, had been paid off and merely had been left on the record.

The appellant denied that the funds in the account of the Davenport Corporation belonged to her or to the corporation, and she alleged that she was merely doing this as a convenience to Errion. She did admit, however, on cross examination, that at one time she received $2500 from these funds as a return on some moneys which Errion had owed to her.

A view of the checks indicates that they were either endorsed in blank by appellant for Davenport Corporation, or were cashier's checks endorsed by her. Thus, the checks themselves are no aid in determining the disposition that was being made of the funds.

Concerning the real estate transactions covering the property in California, the appellant contended that neither she nor her corporation had any interest in this transaction. She contended that she received a telephone call from Errion asking that she send to him $10,000 to buy some timberland. However, instead of doing this, she arranged with a bank in California that the money be paid out under the authority of her nephew there. Although she had said that the money in the account belonged to Errion, she would not permit him to get it, but wanted her nephew to handle it so that it would be used only to buy land "so that I could hold the property, get something on the indebtedness he had." If the money in the bank account belonged to Errion solely, it is difficult to understand her refusing to let Errion handle the transaction entirely without her putting restrictions upon the transfer of the funds.

The appellant contended in her extensive testimony before the jury that she was innocent of any wrongdoing and that she had little knowledge of the activities of her co-defendants. This, of course, is a matter for the jury to determine from all of the evidence in the case. The trial lasted twelve days. We have not attempted to set forth all of the evidence of appellant's activities. It was for the jury to determine where the truth lay. They were not required to believe the appellant.

The offense of conspiracy charged against appellant and her co-defendants can rarely be proved by direct evidence. "To constitute an unlawful conspiracy no formal agreement is necessary. * * *" Blumenthal v. United States, 9 Cir., 1946, 158 F.2d 883, at page 889, affirmed in 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154. Conspiracy may be proved by circumstantial evidence. Pereira v. United States, 1954, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435; Levine v. United States, 9 Cir., 1935, 79 F.2d 364; Van Riper v. United States, 2 Cir., 1926, 13 F.2d 961; Seeman v. United States, 5 Cir., 1938, 96 F.2d 732. In fact, that is the way it is most often proved. See this Court's opinion in Lile v. United States, 9 Cir., 1958, —— F.2d ——, and the cases cited therein.

It was the province of the jury to determine from all of the evidence of the activities of the appellant and her co-defendants whether a conspiracy to defraud had been entered into and if so, which defendants were parties to that conspiracy. Their verdict was that one defendant was not guilty and that the others were guilty.

It is the function of this Court in reviewing a record such as this, after a verdict of guilty, to take the view of the evidence which is most favorable to the appellee. We are required to accept as true all facts which are reasonably shown by the evidence. Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Suetter v. United States, 9 Cir., 1944, 140 F.2d 103; Remmer v.

United States, 9 Cir., 1953, 205 F.2d 277; Schino v. United States, 9 Cir., 1954, 209 F.2d 67.

 We believe the evidence is sufficient to sustain the guilty verdict against the appellant and that the Court did not err in denying her motion for a judgment of acquittal.

Accordingly, the judgment is affirmed.