**UNITED STATES of America**
**v.**
**William Paul KOHNE et al.**
**Crim. A. No. 71-254.**

United States District Court,
W. D. Pennsylvania.

April 25, 1973.

Samuel J. Orr, III, Asst. U. S. Atty., Pittsburgh, Pa., for the U. S.

James A. Ashton, Pittsburgh, Pa., for defendants William Paul Kohne, Patrick Denham and Jeanine Denham.

Martin M. Sheinman, Pittsburgh, Pa., for defendants Patsy Stanizzo and Betty Howden Stanizzo.

Ray Radakovich, Pittsburgh, Pa., for defendant Joseph Tabella.

James R. Fitzgerald, Pittsburgh, Pa., for defendant Paul Patrick Woods.

Gilbert M. Gerber, Pittsburgh, Pa., for defendant Frank DeLucia.

## OPINION AND ORDER

MARSH, Chief Judge.

The ten original defendants in the above captioned case were charged in a two-count indictment with conspiring to violate the federal statute prohibiting illegal gambling businesses, 18 U.S.C. § 1955, in violation of 18 U.S.C. § 371 (Count one) and with the substantive violation of 18 U.S.C. § 1955 (Count two). Two of the indicted defendants, Jeanne Kosh and James Quay, pleaded guilty to the substantive violation immediately after the jury was sworn to try this case. After a five and one-half week jury trial, at which the government presented evidence gathered via court-authorized wiretaps, the remaining eight defendants were found guilty of the substantive violation of 18 U.S.C. § 1955 and acquitted of the conspiracy.

After the jury's verdict, two of the defendants, Patsy and Betty Stanizzo, moved for and were granted judgments of acquittal for the reasons stated in a separate opinion. The remaining six convicted defendants (William Paul Kohne, Paul Patrick Woods, Joseph Tabella, Patrick Denham, Jeanine Denham, and Frank DeLucia) have filed motions for judgment of acquittal and for a new trial.[1] In our opinion the motions should be denied. We consider *seriatim* the following grounds for a new trial raised by defendants:

(1) The court erred in not suppressing the evidence gathered by wiretaps installed on certain telephones.

(2) The voices of certain defendants were not properly identified and therefore the wiretap conversations were erroneously admitted as evidence against them.

(3) The jury's verdict was inconsistent and a nullity.

(4) The court erred in allowing opinion and expert witness testimony.

(5) The court's charge and supplemental instructions were erroneous.

(6) The evidence derived from the search of defendant Tabella's residence should have been suppressed.

(7) The court erred in allowing the trial to continue after two of the defendants pleaded guilty.

(8) The court erred in allowing the jury to view transcripts of the wiretap conversations and to wear earphones while the conversations were played.

Finally, we also consider defendants' contentions that they are entitled to judgments of acquittal because the verdicts are against the weight and sufficiency of the evidence.

*Admissibility of Wiretap Evidence*

Defendants assert and reassert that this court erred in not suppressing the wiretap evidence because:

(1) Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, is unconstitutional;

(2) the affidavits filed in support of the wiretap applications lack probable cause;

(3) defendants' toll records were used illegally in establishing probable cause;

(4) the wiretap application was not properly authorized under 18 U.S.C. § 2516(1);

---

1. Kohne, the Denhams, Tabella, and De-Lucia have moved alternatively for an arrest of judgment, but fail to set forth any grounds cognizable under Rule 33, Fed.R.Crim.P., which governs such mo-tions. Insofar as these defendants have set forth grounds for judgments of acquittal or a new trial in their motions, they have been considered as such.

(5) the wiretap applications fail to show why other investigative techniques would fail as required by 18 U.S.C. § 2518(3);

(6) the government failed to comply with 18 U.S.C. § 2519 requiring reports to be filed with the Administrative Office of the United States Courts;

(7) the government failed to serve copies of the wiretap applications and court orders on all parties at least ten days before trial as required by 18 U.S. C. § 2518(9);

(8) the government presented duplicate tapes, rather than the sealed originals, to the grand jury.

■ Grounds one through five above were decided adversely to defendants when this court ruled on their pretrial motions, United States v. Kohne, 347 F. Supp. 1178 (W.D.Pa.1972).[2] Ground six is untimely [3] and without merit since the failure to file reports with the Administrative Office of the United States Courts is not one of the specifically enumerated grounds for suppression provided under 18 U.S.C. § 2518(10)(a). Grounds seven and eight were ruled upon at trial and merit brief discussion here.

■ As alleged by the defendants in ground seven, the government failed to serve the defendants copies of the applications and court orders for the wiretaps involved in this case at least ten days prior to trial as required by 18 U. S.C. § 2518(9). But, defendants do not contend, nor can they, that this was a deliberate bypassing of the requirement of the Act or that they have been prejudiced by this failure in any manner. The purpose of 18 U.S.C. § 2518(9) is to provide a defendant with notice so that he can move to suppress wiretap evidence prior to trial. U.S.Code Cong. and Admin.News, 1968, p. 2195. The defendants in this case did move to suppress the wiretap evidence prior to trial, asserting as one of the grounds therefor that the applications for the court orders authorizing the wiretaps did not set forth probable cause. At the hearing on their motions on March 16, 1972, defendants, by their counsel, extensively cross-examined witnesses using the applications and court orders they now complain were not served on them ten days prior to trial.[4] Furthermore, these documents were offered into evidence as exhibits at this hearing,[5] and prior to the hearing had been public records on file in the Office of the Clerk of Court since January 14, 1972.[6] Since the record clearly establishes that defendants had access to these documents almost one year prior to trial and, in fact, moved to suppress the wiretap evidence because of alleged insufficiencies in them, we find substantial compliance with the statute, and hold that the refusal to suppress the wiretap evidence during the trial was correct. United States v. Wolk, 466 F.2d 1143 (8th Cir. 1972); cf. United States v. Eastman, 465 F.2d 1057 (3d Cir. 1972).

■■ In ground eight above the defendants moved to suppress the wiretap evidence because the tapes presented to the grand jury were duplicates of the

---

2. See also, United States v. Ciamacco, Criminal No. 72–150 (W.D.Pa. 3/9/73), disposing of pretrial motions attacking the same wiretap authorizations involved in this case.

3. If it were necessary to decide the factual issue raised by this contention, an evidentiary hearing would be required to determine if reports were actually filed. We see no reason why this issue could not have been raised and decided before trial. Rule 12(b)(3), Fed.R.Crim.P.; 8 Moore's Federal Practice—Cipes, Criminal Rules ¶ 41.08.

4. The transcript of the March 16, 1972, hearing is replete with references by defense counsel to the relevant applications and court orders. See, for example, transcript pp. 35–36, 42, 62–63, 71–72, 83–84, 92–117, 126, etc.

5. See transcript of the March 16, 1972, hearing, pp. 97–98.

6. Interestingly two pretrial conferences were held in this case, but defendants did not complain about the failure to serve the applications and court orders until after the jury was sworn and double jeopardy attached.

**1058**

sealed tapes used at trial. The sealing procedure required by 18 U.S.C. § 2518(8)(a) is aimed at protecting the confidentiality of the tapes and, as a secondary purpose, aids in establishing a chain of custody at trial. United States v. Cantor, 470 F.2d 890, 893 (3d Cir. 1972); United States v. Poeta, 455 F.2d 117, 122 (2d Cir. 1972). But 18 U.S.C. § 2518(8)(a) also specifically provides that duplicate tapes may be made, and 18 U.S.C. § 2517(2) allows law enforcement officers to use duplicate tapes "to the extent such use is appropriate to the proper performance of [their] duties." We believe that it was appropriate under 18 U.S.C. §§ 2517(2), 2518(8)(a) to prepare and present duplicate tapes to the grand jury so that the sealed originals would remain intact for inspection by defendants and use at trial. In our opinion this procedure did not require that all wiretap evidence be suppressed.

*Adequacy of the Voice Identification*

Defendants, Tabella, Woods, and DeLucia, object to the admission of wiretap recordings of phone conversations against them, contending that their voices were never properly identified so as to establish their participation in these conversations. We disagree.

■ As to Woods and Tabella, their voices were identified by Special Agents Thompson and Britton, respectively. Also, the evidence showed that the phones that were tapped were located in their residences, and they were referred to by name during both incoming and outgoing calls occurring on these phones.[7] The identification evidence by the agents, coupled with the strong circumstantial evidence, satisfactorily identified their voices so as to support the jury's findings that they were the participants in the gambling conversations. United States v. Alper, 449 F.2d 1223, 1229 (3d Cir. 1971); Carbo v. United States, 314 F.2d 718, 743 (9th Cir. 1963). Moreover, William Kohne testified in his own defense and implicated Woods and Tabella in his gambling business.

■ The identification of Frank DeLucia's voice presents a different problem. DeLucia's voice was not identified by any witness and the government relies entirely on circumstantial evidence to support its contention that his is the voice on the recordings; this mode of identification is complicated by the fact that Frank DeLucia's adult son, Frank DeLucia, Jr., allegedly resided with him.[8] The circumstantial evidence adequately established that someone named "Frank" received and placed telephone calls dealing with illegal gambling from telephones located in the DeLucia residence. Two sets of calls support the government's contention that the senior DeLucia was the "Frank" participating in the gambling operation.[9] In these calls, Woods called the DeLucia residence, a child answered, Woods asked if the child's father, "Frank", was there; DeLucia's wife, "Becky", then came to the phone and informed Woods that "Frank" was at Leo's; Woods then called a number registered to Leo T. McGrath and spoke to "Frank" about the gambling operation. Based on these

---

7. Some confusion existed as to whether a telephone having number 882–8195 was registered to one Virginia Warren or Virginia Fox, and, moreover, whether this phone was located in the Woods' residence. The government's witness, C. Robert Ellis, made a further check of telephone company records and established that this phone was located in the Woods' residence as the government contended. Similarly, the fact that Tabella had a young son named "Joe" only goes to the weight to be given Special Agent Britton's voice identification and does not make such testimony inadmissible *per se*. (See also, conversation 167, a call to "Joe" at the Tabella residence wherein "Joe" complains that his "kid" has his car.)

8. While evidence was submitted at trial establishing that DeLucia had a son named Joseph, we do not recall any evidence concerning a Frank DeLucia, Jr., and assume *arguendo* that defense counsel's representations at oral argument concerning a Frank, Jr., have a basis in the record.

9. See conversations 102, 107, 146 and 147.

two sets of conversations the jury could find, with reason, that the senior De-Lucia, rather than his son, was participating in the illegal gambling operation.[10]

### The Inconsistency in the Jury's Verdicts

Numerous objections are based upon the jury's verdicts being inconsistent in that they acquitted the defendants of conspiracy and convicted them of the substantive violation. Defendants contend that the indictment was duplicitous; that the jury's verdicts are inconsistent and a nullity; and, because the defendants were ultimately acquitted of the conspiracy count, declarations of co-conspirators were erroneously admitted into evidence at the trial.

 Since all defendants were acquitted of conspiracy defendants are entitled to no relief even if the indictment was duplicitous, and assuming *arguendo* that the verdicts are inconsistent, such inconsistency has long been one of a jury's prerogatives. United States v. Fiorella, 468 F.2d 688, 690 (2d Cir. 1972). Likewise, the fact that the defendants were charged with conspiracy, but acquitted, despite strong evidence of conspiracy, does not retroactively render inadmissible the hearsay which was allowed into evidence under the declarations of the co-conspirators exception to the hearsay rule. This hearsay evidence remained competent and its admission does not vitiate the jury's verdict finding the defendants guilty only of the substantive offense. United States v. Herr, 338 F.2d 607, 610 (7th Cir. 1964); Burns v. United States, 286 F.2d 152, 155 (10th Cir. 1961); Coplin v. United States, 88 F.2d 652, 661 (9th Cir. 1937).

We find nothing talismanic in the form in which the jury rendered its ver-

dicts which would entitle these defendants to a new trial.

### Opinion and Expert Witnesses

Defendants contend that this court erred in allowing Special Agents Meek, Thompson, and Burton to give certain opinions, and in allowing the government's expert on gambling, Special Agent T. C. Whitcomb, to testify when defendants were not supplied with a copy of his report prior to trial.

 Special Agent Meek gave his opinion that the pen register, an instrument used in this case to determine the outgoing telephone numbers being dialed on monitored phones, was an accurate instrument. Agent Meek had not tested the pen register used in this particular case, but testified to the accuracy of the pen register generally. Agent Meek was a college graduate; he had one month of specialized training by the Federal Bureau of Investigation in electronic surveillance, and eight months practical experience in such work; he had read books dealing with the pen register; and he had used the pen register when working on two other wiretap cases. While Agent Meek was not an eminently qualified expert, we believe he was sufficiently qualified to give his opinion as to the pen register's reputation for accuracy. His opinion found later support in the numerous recorded conversations in which the parties to the calls were identified by name or voice identification as being individuals whose residences contained telephones bearing the same numbers which the pen register had reported.

 Agents Thompson and Burton gave certain opinions concerning gambling. They were not experts as gamblers, but both did have considerable experience in investigating gambling cas-

10. While the calls in which DeLucia's wife and children participated appear innocuous on their face—the type of call that should be terminated by the monitoring agent—we believe the fact that Woods was attempting to speak to "Frank" put the monitoring agents on notice of the evidential value of the calls, and they were therefore properly monitored.

es. We believe such investigative experience sufficiently qualified these agents so as to allow them to express their opinions on certain aspects of the gambling operation involved in this case. Moore v. United States, 394 F.2d 818 (5th Cir. 1968); Commonwealth v. Ametrane, 205 Pa.Super. 567, 210 A.2d 902 (1965), aff'd, 422 Pa. 83, 221 A.2d 296 (1966); Commonwealth v. Smith, 186 Pa.Super. 89, 140 A.2d 347, 349 (1958).

 Finally, defendants object to the testimony of Special Agent T. C. Whitcomb, contending that they were entitled to have a report covering his testimony prior to trial. We have found no authority which entitles a defendant, as a matter of right, to a gambling expert's report. Rule 16, Fed.R.Crim.P., is limited to reports of physical or mental examinations, and scientific tests or experiments. In any event, when this court was informed by the government that it intended to use an expert witness on gambling, his report was ordered to be supplied to the defendants at least five days before he testified, this was done, and none of the defendants requested a continuance to further study Whitcomb's report. On these facts, we can see no prejudice to the defendants because Whitcomb's report was not supplied prior to trial. *Cf.* Rule 16(g), Fed.R.Crim.P.

### *Errors in the Court's Charge and Supplemental Instructions*

 Defendants' attack on the court's charge centers on the definition of the word "conduct" and the supplemental explanation of "knowingly and

wilfully" given in response to a question from a juror.

In the charge, this court instructed that all participants in the operation of an illegal gambling business, except customers and persons placing bets, are conducting the business within the meaning of 18 U.S.C. § 1955. We believe this to be a correct statement of the law. United States v. Ceraso, 467 F.2d 653, 656 (3d Cir. 1972); United States v. Becker, 461 F.2d 230, 232 (2d Cir. 1972); *cf.* United States v. Palmer, 465 F.2d 697, 699 (6th Cir. 1972); United States v. Riehl, 460 F.2d 454, 459 (3d Cir. 1972); United States v. Harris, 460 F.2d 1041, 1049 (5th Cir. 1972). Contrary to defendants' contention, we do not believe this court erred in defining the term "conduct".

 During the course of deliberations, Juror No. 10 sent to the court a statement and later a question dealing with the use of the terms "knowingly and wilfully" in the indictment.[11] It seemed from these communications that this juror felt that the government had the burden of proving that the defendants knew that a federal law prohibiting illegal gambling businesses had been enacted and that they wilfully and knowingly violated it. In response to this juror's second question, an instruction defining the terms "knowingly and wilfully" was given, and the jury was told they were not required under the indictment or the law to find that the defendants knew the size of, or the number of participants in the illegal gambling business, or that a federal law proscribed such a business; but, that it was only necessary that the defendants knew that Pennsylvania state law made their activ-

11. Juror No. 10's statement was as follows:

"I have no doubt in my mind that the defendants performed illegal gambling acts.

"I myself did not know there was a Federal Law enacted prohibiting gambling.

"I can not in all fairness render a verdict that all defendants of [sic] the specific wording.—'wilfully' and 'know-

ingly' conspired against Title 18 United States Code. First count. and 'knowingly' and wilfully' [sic] ran a gambling operation in violation of Title 18 United States Code. Second Count."

The question was as follows:

"Am I permitted to render a verdict if the words wilfully and knowingly in connection with the words regarding Title 18 United States Code are omited [sic]?"

ities criminal.[12] Defendants object to the correctness of this instruction.

We believe that a fair reading of the indictment shows that it only charges that the defendants "knowingly and wilfully" performed the proscribed act with specific intent to do something the state law forbids, and it does not interject the requirement that they did so with knowledge that a federal law proscribed their acts as well.[13] Nor do we believe the law requires such knowledge. While no case clearly decides the issue, 18 U. S.C. § 1955 is the type of statute only requiring a general criminal intent,—a voluntary and intentional doing of an act which the statute makes unlawful —and knowledge that such act is unlawful under federal law is not necessary. United States v. Erlenbaugh, 452 F.2d 967, 973 (7th Cir. 1971), aff'd, 405 U.S. 973, 92 S.Ct. 1194, 31 L.Ed.2d 247 (1972); United States v. Miller, 379 F. 2d 483, 486 (7th Cir. 1967); cf. United States v. Weiler, 458 F.2d 474 (3d Cir. 1972). We believe the response to the juror's question was a correct statement of the law and properly given to clear up his obvious misunderstanding as to the effect to be given the words "knowingly and wilfully" in the indictment.[14]

At trial defendants also objected to the court's supplemental instruction to the jury that even though the indictment charged multiple acts in the conjunctive, proof that one of the acts so charged was committed by a named defendant was sufficient to support his conviction. This principle is so well established that this objection does not merit discussion here. United States v. Gimelstob, 475 F.2d 157 (3d Cir. 1973).

### Search of the Tabella Residence

Defendant Tabella contends that Agents of the Federal Bureau of Investigation searched his home under color of a search warrant for another residence, thereby vitiating any consent from him for such search and rendering inadmissible certain demonstrative evidence seized by the government and used at trial as the product of an illegal search and seizure. This objection was raised for the first time at trial and is untimely under Rule 12(b)(3), Fed.R. Crim.P. Moreover, Tabella's reliance on

---

12. See transcript of the court's charge, pp. 76–78.

13. The indictment charges:
 "That from on or about the 1st day of December, 1970, through on or about the 12th day of July, 1971, in the Western District of Pennsylvania, * * * *the defendants herein, did knowingly and wilfully conduct, finance, manage, supervise, direct, and own an illegal gambling business,* such business having a gross revenue of $2,000 or more on one or more single days, involving five or more persons in its conduct, financing, management, supervision, direction, and ownership, being in substantially continuous operation for a period in excess of thirty days, and being in violation of the laws of the Commonwealth of Pennsylvania, Purdon's Pennsylvania Statutes, Title 18, Sections 4601 and 4607; in violation of Sections 1955 and 2, Title 18 United States Code." (Emphasis supplied.)
 While the emphasized portion of the indictment does require that a defendant have *specific intent* to participate in an "illegal gambling business", it does not require a specific intent to violate the federal statute and, we believe, the intent requirement of this indictment is satisfied when a defendant participates in a proscribed manner in a gambling business he knows *state* law forbids. In short, "illegal gambling business" as used in the emphasized portion of the indictment is not a term of art incorporating all the jurisdictional requirements of size and continuity set out in the federal statute, rather the term as used is a descriptive one referring to a gambling business illegal under state law. The remainder of the indictment, which charges the elements necessary to bring the business within the reach of the federal statute, would be superfluous if the term "illegal gambling business" in the emphasized portion was an all inclusive term of art.

14. The jury delivered a unanimous verdict within 11 minutes after they were given this supplemental instruction. See also, United States v. Kohne, 358 F. Supp. 1046 (W.D.Pa. 1973), dealing with defendants' contentions that Juror No. 10 was coerced into rendering a verdict.

**1062**

Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), is misplaced [15] because the undisputed facts surrounding the search of his residence show that he gave his consent knowingly, and the agents did not in any way act under color of an invalid warrant.

■ The only evidence concerning the search of Tabella's residence came from Special Agent Britton. He testified that he went to Tabella's residence at 192 Provost Street on July 12, 1971; he informed Tabella he wanted to search for gambling paraphernalia and that he had a search warrant for Tabella's former residence at 3710 Sawmill Run Boulevard; that he stressed that he had no legal authority to search the new residence unless Tabella consented; and that Tabella reviewed a consent to search form, refused to sign it, but orally informed Special Agent Britton that he consented to the search.

Clearly this is not a case where officers searched under color of an invalid or nonexistent warrant; therefore Bumper v. North Carolina, *supra*, is inapposite to these facts. Here the agents took great pains to inform Tabella they did not have a valid search warrant, and Tabella, obviously to give the impression that he had nothing to hide, voluntarily and knowingly consented to the search. On this record we can only find that Tabella gave valid consent to have his residence searched, and, contrary to defendant's contention the evidence derived therefrom was properly admitted at trial. *Cf.* Hoover v. Beto, 467 F.2d 516, 520 (5th Cir. 1972); Leeper v. United States, 446 F.2d 281, 284 (10th Cir.

1971); United States ex rel. Combs v. La Vallee, 417 F.2d 523, 525 (2d Cir. 1969).

### The Guilty Pleas of Quay and Kosh

■ After the jury was sworn and counsel for the defendants introduced, two defendants, James Quay and Jeanne Kosh pleaded guilty in the absence of the jury. The remaining defendants immediately moved for a mistrial, contending that the conspicuous absence of these two defendants would prejudice them. The motions were denied, but the court offered to inform the jury of the pleas and give the required cautionary instruction.[16] This offer was unanimously declined by defendants. Accordingly, the jury was never told that Quay and Kosh had pleaded guilty, but was told in the court's charge that they were not permitted to speculate on the absence of Quay and Kosh from the trial.[17] Defendants contend that it was error to continue with the trial after these guilty pleas were accepted. We disagree.

The cases clearly hold that it is not error to accept the guilty pleas of a co-defendant during the course of a trial. United States v. Broadhead, 395 F.2d 761 (2d Cir. 1968); United States v. Kahn, 381 F.2d 824, 836 (7th Cir. 1967); United States v. Edwards, 366 F.2d 853 (2d Cir. 1966); Wood v. United States, 279 F.2d 359 (8th Cir. 1960); United States v. Stallings, 273 F.2d 740 (2d Cir. 1960); Davenport v. United States, 260 F.2d 591 (9th Cir. 1958); *cf.* Freije v. United States, 386 F.2d 408 (1st Cir. 1967). The only question with such procedure being the propriety of the court informing the jury of such a

---

15. In Bumper officers asserted that they had authority to search a private residence under a search warrant, but at trial the prosecution relied on consent to validate the search not a warrant. The Supreme Court held that the officers' representation that they had a warrant vitiated any consent to the search.

16. The instruction tendered to defendants was patterned after those given

in Wood v. United States, 279 F.2d 359 (8th Cir. 1960), and Davenport v. United States, 260 F.2d 591, 596 (9th Cir. 1958), and, in short, told the jury that the guilty pleas of the co-defendants are not evidence against the remaining defendants, nor are they evidence that a crime has been committed.

17. See the transcript of the court's charge at p. 6. Cf. United States v. Panepinto, 430 F.2d 613 (3d Cir. 1970).

guilty plea on its own motion. Compare United States v. Edwards, *supra*, 366 F. 2d at 870, with Wood v. United States, *supra*, 279 F.2d at 363.[18] In this case the defendants, for obvious reasons of strategy, decided that the jury should not be informed of the guilty pleas and given the appropriate cautionary instruction. The defendants were not entitled to have a mistrial declared merely because two of the defendants pleaded guilty. The options that were available were explained to them and they made a *unanimous* choice that the jury not be informed of the guilty pleas of their co-defendants. This court respected the defendants' decisions and considering all the circumstances, we perceive no error in the procedure followed.

### Use of Transcripts and Earphones by the Jury

Defendants contend that this court erred in allowing the jury to follow the taped conversations with the aid of transcripts, and that they were denied a public trial because the jury used earphones to better hear the taped conversations.

The transcripts used by the jury were available to defense counsel before trial and they were ordered to inspect and submit written objections to them prior to trial.[19] Furthermore, objections to the accuracy of the transcripts were considered at trial and the defendants were given the benefit of any doubt concerning their accuracy. Under these circumstances we believed it was appropriate to use those transcripts to which no substantial objection was made as visual aids to the jury in following the recorded evidence.

Likewise, we do not believe that the fact that the court, the jury, defendants and counsel were permitted to use earphones to better hear the recorded conversations denied defendants a public trial. During all but a few days of trial a public address system enabled spectators to hear the recorded exhibits offered by the government, and at all times during the trial extra earphones were available for spectators. In any event this very issue has been raised before and, without exception, it has been held that the use of earphones does not infringe upon a defendant's right to a public trial. See: Iva Ikuko Toguri D'Aquino v. United States, 192 F.2d 338, 365 (9th Cir. 1951); Gillars v. United States, 87 U.S.App.D.C. 16, 182 F.2d 962, 977 (1950). Even when a public address system and the extra earphones were not available for spectators we agree with the *D'Aquino* case, *supra*, where it was stated at 365:

" \* \* \* Essentially the records were exhibits and we think that appellant might as logically argue that she was denied a public trial because certain exhibits such as photographs, samples of handwriting, etc., although examined by the parties and by the jury were not passed around to the spectators in the courtroom. We think that the contention as to lack of public trial is wholly without merit."

### The Weight and Sufficiency of the Evidence

All defendants object to the weight and sufficiency of the evidence, contending that they are entitled to judgments of acquittal. In light of the jury's verdict, the government is entitled to have the evidence viewed in a light most favorable to the prosecution, respecting the right of the jury to draw inferences. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. De Cavalcante, 440 F.2d 1264, 1273 (3d Cir. 1971). So viewed

---

18. At least one treatise has opted that it is better that the jury not know of a co-defendant's guilty plea. Wright, Federal Practice and Procedure: Criminal § 499, pp. 339–340.

19. See paragraph 6 of the pretrial stipulation and order entered January 3, 1973.

the evidence at trial established the following:

William Kohne admittedly managed, financed, directed and owned a substantial gambling operation involving both numbers and sports betting. Kohne hired employees, gave orders to subordinates, was ultimately responsible for paying off winners, and insured that his operation remained solvent by laying off large bets. In the legitimate business world Kohne would be characterized as the chief executive officer of the illegal gambling business proved by the government.

Defendants, Joseph Tabella, Jeanine Denham and Patrick Denham, were secondary level employees, under Kohne, who would gather numbers bets and pass them on to Kohne or, in the case of Tabella, to Kohne's salaried employee Jeanne Kosh.[20]

Defendants Woods and DeLucia were involved in the sports side of the Kohne gambling business. Woods received the betting line (point spread) from DeLucia,[21] passed it on to bettors and subordinates, accepted bets on sports events,[22] and laid off some of the larger bets to DeLucia.[23] Woods was in constant contact with Kohne, receiving instructions from him,[24] discussing and dividing up winnings with him,[25] and reporting line information and on the progress of the sports aspect of the Kohne operation.[26] DeLucia dealt only with Woods, but was a necessary and indispensable part of the sports side of the Kohne business and therefore a participant therein.[27] United States v. Riehl, 460 F.2d 454, 459 (3d Cir. 1972). In addition a certain amount of overlap existed between the two segments of the Kohne business as evidenced by Woods occasionally accepting numbers bets and passing them on to Kohne's employee Kosh.[28]

■ The evidence showed that the combined sports and numbers gambling operation controlled by Kohne involved five or more participants, was in substantially continuous operation for over 30 days (February 6 to April 6, 1971), and grossed over $2,000 on certain days.[29] We believe the above to be sufficient to support defendants' convictions.

Defendants contend that the government charged only one business was involved, but proved two businesses—a numbers business and a sports business —and that applying the law to the evidence in this case, that evidence cannot support a conviction on the one business theory charged in the government's indictment. We disagree.

■ The statute the defendants have been convicted of violating, 18 U.S.C. § 1955, makes no distinction between the type of gambling conducted but speaks in the generic term of a

---

20. As to Tabella, see conversations 4 and 155–168. As to Jeanine and Patrick Denham, see conversations 1, 2, 4, 17–20, 33–36, 39–42, 54–56, 68–70, 213 and 214.

21. See conversations 124, 135, 147, 197, 198, 199, 200 and 201.

22. See conversations 112–119; 128–134.

23. See conversations 103, 125, 139, 140, 148, 149, 152 and 203. This procedure necessitated Woods and DeLucia to compare accounts, see conversations 124, 147, 152 and 202.

24. See conversations 7, 11, 14, 16, 82, 90, 91, 95, 109, 110 and 111.

25. See conversations 15, 31, 82, 95, 126 and 153.

26. See conversations 6, 8, 9, 10, 12, 38, 81, 98, 109, 127 and 150.

27. In addition to the conversations, the government also introduced betting slips, a quantity of rice paper, and other assorted gambling paraphernalia seized during raids conducted on the residences of all six defendants presently under consideration.

28. See conversations 141, 142 and 154.

29. The evidence was also sufficient to show that the numbers and sports aspects of the operation, when considered separately, met the requirements of 18 U.S.C. § 1955, but this was not the theory of the government's case and is irrelevant for purposes of the present motions.

 

"gambling business". The statute is aimed at business-type gambling operations of considerable size and specifically states that the subject matters of the Kohne business, book-making and the numbers game, come under the term "gambling". See: U.S.Code and Admin.News, 1970, p. 4029 and 18 U.S.C. § 1955(b)(2). Nowhere in the statute or the legislative history is it intimated that the various innumerable species of gambling are to be segregated and considered separately in determining if the statutory requirements are met. All syndicated gambling proscribed by state law is the focal point of the statute, with emphasis on size and continuity, rather than the name of the particular game being played by the patrons of the business.

We need go no further than to state that if defendants' contention was correct, it would be (hypothetically) possible for someone to own a gambling casino, hire three employees to maintain slot machines, three others to operate roulette wheels, and three more to oversee dice tables, remain in operation over 30 days, gross over $2,000 daily, and violate the law of the state in which the casino was operating—all without coming within the parameters of 18 U.S.C. § 1955. We do not believe this to be the law.

In this case William Kohne owned, financed, supervised, and directed *one* illegal gambling business involving two types of gambling. He was the chief executive officer and made managerial decisions. Given the other statutory requirements, this is precisely the type of syndicated business 18 U.S.C. § 1955 was aimed at. Because of Kohne's key position we believe the jury properly found that the numbers operation and the sports operation were one illegal gambling business for purposes of 18 U.S.C. § 1955.[30]

Defendants' motions will be denied. An appropriate order will be entered.

---

30. This issue was submitted to the jury in the court's charge, and they obviously resolved it in favor of the government. See transcript of the court's charge, pp. 34–35.